*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0267p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

No. 08-6124

MARIA ARNOLD; JACOB KENDRICK ARNOLD,

*Plaintiffs,*

CAROLINE ELAINE ARNOLD,

*Plaintiff-Appellant,*

*v.*

JAMES WILDER; CITY OF STRATHMOOR
VILLAGE,

*Defendants-Appellees,*

PHYLLIS ANN BREUER; CITY OF KINGSLEY;
DEWEY CORNELL, JR.,

*Defendants.*

Nos. 09-6178/6179

MARIA ARNOLD,

*Plaintiff-Appellant/Cross-Appellee,*

JACOB KENDRICK ARNOLD; CAROLINE
ELAINE ARNOLD,

*Plaintiffs,*

*v.*

JAMES WILDER; CITY OF STRATHMOOR
VILLAGE,

*Defendants-Appellees/Cross-Appellants,*

PHYLLIS ANN BREUER; CITY OF KINGSLEY;
DEWEY CORNELL, JR.,

*Defendants.*

Nos. 08-6124; 09-6178/6179

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 04-00649—Charles R. Simpson III, District Judge.

1

Argued:  June 8, 2011

Decided and Filed:  September 14, 2011

Before:  KEITH, GIBBONS, and WHITE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Harry B. O'Donnell IV, Louisville, Kentucky, for Appellants.  David Leightty, SMITH, GREENBERG & LEIGHTTY, PLLC, Louisville, Kentucky, for Appellees. **ON BRIEF:** Robert D. Mattingly, DeCAMILLIS & MATTINGLY, PLLC, Louisville, Kentucky, for Appellants.  David Leightty, SMITH, GREENBERG & LEIGHTTY, PLLC, Louisville, Kentucky, L. Stanley Chauvin III, NASH, NASH, STOESS & CHAUVIN, Louisville, Kentucky, for Appellees.

_____

**OPINION**

_____

HELENE N. WHITE, Circuit Judge.  Plaintiff Maria Arnold (Arnold) appeals the district court's grant of defendants-appellees James Wilder's (Wilder) and the City of Strathmoor Village's (Strathmoor) (collectively, defendants) motion for remittitur of the jury's punitive-damages award.  Arnold's daughter, Caroline Arnold (Caroline), appeals the district court's grant of judgment as a matter of law dismissing her intentional infliction of emotional distress (IIED) claim.  Wilder and Strathmoor cross-appeal, arguing that the district court erred in denying their motion for alternative or cumulative post-trial relief with respect to Arnold's claims of false arrest and malicious prosecution and certain evidentiary rulings.  We **AFFIRM** in part, **MODIFY** the district court's reduction of the punitive-damages award and **REMAND** for entry of judgment consistent with this opinion.

# I.

## A.

This case arose out of an incident that took place on October 25, 2003, in Kingsley, Kentucky (Kingsley). Arnold, who was recently divorced, lived with her three children, Jacob, Elizabeth, and Caroline, in her childhood home in Kingsley. At approximately 5:00 p.m., Jacob, who was thirteen years old at the time, was playing outside with his friends. Arnold was in the house helping Caroline, who was seven years old at the time, get ready for a Halloween costume party.

According to Arnold, she walked outside to tell Jacob and his friends to come back inside. Because she was only planning to walk out onto the driveway, she did not put shoes on prior to leaving the house. Once outside, Arnold saw Officer Wilder parking his police car across the street in the driveway of Phyllis Ann Breuer (Breuer), the mayor of Kingsley. As Wilder went to the front porch to speak with Breuer, Jacob and his friends, who had split up into separate groups, walked toward Arnold from two different directions. Three of the boys met up with Arnold in the driveway. Wilder crossed the street and stopped two of the boys in front of Arnold's house.

It appears that Arnold knew the purpose of Wilder's visit even before she spoke with him, as Breuer had called the police several times in the past to complain that neighborhood children, including Jacob, were "running through the yards, jumping over fences, [and] running through flower beds." D.J. Reynolds (Reynolds), the Chief of Police of Strathmoor,[1] had gone to Arnold's house twice prior to October 25, 2003, to explain Breuer's complaints to her "and [to] let her know that the boys were going to have to stop doing that." On October 25, Breuer again contacted the police – by calling Reynolds and leaving a message – and complained that "children [were] running through yards and flower beds and hopping over fences [and] needed to be brought under control." Reynolds was off-duty when he received the message, so he called Wilder –

---

[1]Kingsley does not employ its own police force. Rather, it has an agreement with Strathmoor, an adjacent city, pursuant to which the Strathmoor Police Department provides police protection to Kingsley.

the on-duty officer – and told Wilder to "respond to the call and stop the boys from running through the yards."

Arnold testified that after she saw Wilder stop two of the boys, she walked across the front yard and asked Wilder, "Can I help you?" Wilder asked, "Are you the parent?" Arnold responded that she was the parent of one of the boys, but that she was responsible for all of them. Wilder stated "Well, I'll talk to you first," and Arnold then told the boys "go in and get ready, call your moms." As the boys turned to go inside, Wilder said "I'm not finished with them." Arnold responded by saying, "I understand. I was just going to have them call their moms. D.J. Reynolds has talked to me." At this point, according to Arnold, Wilder began to get very angry with her for no apparent reason. Getting "angrier and angrier," Wilder came toward Arnold and started "to turn around and get between [Arnold] and the house," blocking her from getting inside the house. Arnold again told the boys to go inside and get a telephone, instructing Jacob to "call papa" because she wanted her father "to come and be with the kids and help [her]." Wilder then told her, "Your daddy can't help you now." The next thing Arnold remembered was Wilder knocking her to the ground. Once she was on the ground, the children ran out of the house and, as Arnold attempted to tell them "to back off [and] . . . go back to the house," Wilder put Arnold into a chokehold and began to drag her across the street to his police car. Caroline followed Wilder and Arnold, shouting "I don't have a daddy. I don't have a daddy." The other children also followed Wilder and Arnold across the street. At no point did Wilder tell Arnold that she was under arrest or that he was going to arrest her.

Once they were at Wilder's police car, Arnold asked Wilder to "please wait until somebody gets here for the kids." Instead, Wilder shoved her in the back of the car and, when she was inside the car, sprayed her with pepper spray. Arnold had no memory of struggling with Wilder or kicking him during this time. Wilder closed the car door, locking Arnold inside. As Wilder walked around to the front of the car, one of Jacob's friends ran up to the car and opened the door, letting Arnold out. Arnold ran to the house with the boys and Caroline. When everyone was inside the house, the boys

proceeded to call 911, Arnold's father, and their mothers. Caroline had gotten pepper spray on herself, likely from hugging Arnold after she was sprayed, and Arnold took Caroline to the bathroom to attempt to wash off the pepper spray.

Tyler Purcell (Purcell), one of Jacob's friends, testified consistently with Arnold's account. He stated that Arnold and Wilder first spoke while standing in Arnold's front yard. Arnold told the boys to go inside, so they observed the situation from inside Arnold's house by looking through a window. Purcell never saw Arnold become visibly angry, not did he hear her raise her voice or yell at Wilder. He observed Wilder pull out handcuffs, Arnold back up, and Wilder tackle Arnold to the ground. At this point, all the children ran outside and stood within approximately five feet of Wilder and Arnold. Purcell then saw Wilder put Arnold in a chokehold while they were both on the ground. As Wilder pulled Arnold up and began dragging her across the street, with her bare feet hitting the ground, Purcell saw Arnold's face turning purple. Purcell testified that as Wilder forced Arnold into the police car, she hit her head on the roof of the car, and while Arnold lay across the back seat of the car, with her feet facing toward the door, Wilder sprayed her with pepper spray.

Sean Lutes (Lutes), another of Jacob's friends, Caroline, and Jacob also testified consistently with Arnold and Purcell. Jacob additionally testified that after Wilder dragged Arnold to the police car, "[h]e opened up the door and started to pull her in, and she grabbed on to the sides . . . . [H]e grabbed her head and slammed it into the . . . glass panel in between the back seat and the front . . . . And then he started trying to push her back in and she hadn't let go of the sides."

Officers from the Louisville Metro Police Department (LMPD) arrived at Arnold's house shortly after the incident took place. LMPD Sergeant Amy Brown (Brown), the highest-ranking police officer on the scene, observed Wilder standing by his police car. She asked Wilder what had occurred and he informed her that "a prisoner had escaped from his car and had gone into the house and locked the house and was not coming out." Brown walked up to the house and tried to get Arnold to come out, but she was adamant about not opening the door. Arnold testified that she had previously started

to open the door but, as she did so, "Wilder started running towards [them], so [she] slammed the door." Arnold refused to open the door until her brother, John DeCamillis (DeCamillis), arrived on the scene.[2]

DeCamillis, a defense attorney, testified that once he identified himself to the officers standing outside the home, he was asked to speak with his sister to get her to come out of the house. Arnold initially told her brother that she was not coming out "until that police officer over there [was] gone," but DeCamillis ultimately persuaded her to open the door. Eventually, DeCamillis was able to enter the house and check on the children, who were scared, crying, and hysterical.

Armacost stayed by his car while DeCamillis was permitted to go up to Arnold's house. As DeCamillis walked up to the front door, Armacost observed an officer, whom he later identified as Wilder, walk away from the front door, stomp across the front yard, and tell another officer who tried to speak to him that he was "not calming down." Armacost also heard Wilder say "I'm going to lock this fucking cunt up . . . . These people are going to learn to respect me."[3]

When police officers, including Brown, were able to enter Arnold's home, Arnold told them about her altercation with Wilder. Brown observed the children crying and saw that Arnold and the children had pepper spray on them. The officers began flushing everyone's skin, as Emergency Medical Services (EMS) had not been called to the scene, which was standard procedure whenever mace or pepper spray was used by an officer. Brown went back outside, told Wilder "we could iron this out without taking her to jail," and suggested that he write Arnold a citation. Wilder refused to do so. Brown went back inside the home and told Arnold that Wilder wanted to arrest her and that there was nothing she could do. She recommended that Arnold "calmly walk out

---

[2]DeCamillis's mother had called him and told him to go to his sister's house as quickly as he could. Brad Armacost (Armacost), DeCamillis's friend, had just arrived at DeCamillis's house at the time of this telephone call because the two had planned on playing golf, and Armacost drove DeCamillis to Arnold's house.

[3]After DeCamillis exited the house and approached Armacost as Arnold was being led away by police officers, Armacost told DeCamillis "you have reason to be concerned. She can't go anywhere with that officer."

so it wouldn't rile the kids up again." Once Arnold was handcuffed and placed in the back of Wilder's police car, Brown again spoke with Wilder and told him, "We don't need to do this. Let's not do this. We don't . . . need to go this route." Wilder responded, "Bitch, I am taking that fucking whore to jail and nobody's stopping me."[4]

Wilder then left the scene with Arnold in the back of his police car. He stopped the car at the end of the street and briefly spoke with Reynolds, who had just arrived and wanted to know what had transpired.[5] Wilder then got back in the car and drove to the police station. He was on the telephone during the drive, and Arnold heard him say, "You know, I'm going to teach . . . these people in this neighborhood . . . a lesson." While they were at the police station, Arnold heard Wilder ask another officer "How can I make this a felony" while completing some paperwork.

Wilder's version of the day's events differs from Arnold's in several respects. He testified that after he learned of Breuer's complaint from Reynolds, he went to Breuer's home and spoke with her. Breuer told him that there was an ongoing problem with neighborhood children running through yards. Wilder indicated to Breuer that he saw no children anywhere on the street, and Breuer stated "well, there's two of them coming out between the houses there" and, as soon as Wilder saw the two boys, Breuer noted "there's the rest of them coming this way," in reference to the second group of boys.

Wilder testified that he did not speak with Arnold while she was in her yard; instead, he stated that as he was talking to the boys, Arnold ran toward him yelling, "stop, don't talk to them, get away from them . . . . ," and that they spoke while standing directly across the street from Breuer's house, which was about four or five houses down

---

[4]Brown testified that when Reynolds arrived on the scene as Wilder was leaving, she informed Reynolds about what happened and "told him point-blank, if that officer worked for me, I would make sure he was fired today." Reynolds did not recall speaking to Brown regarding Wilder.

[5]Wilder had called Reynolds and informed him that he had arrested Arnold. The Strathmoor Police Department seldom arrested citizens, and Reynolds considered the situation to be unusual. As a result, Reynolds informed Wilder that he would meet him at the scene. During their brief meeting, Reynolds instructed Wilder to take Arnold to jail because he could not "unarrest" her and then meet him in his office when Wilder returned. Reynolds ultimately suspended Wilder for some period of time, although it is unclear whether this suspension was directly related to this incident.

the street from Arnold's house.  Wilder further testified that "it was several minutes before [Arnold] finally admitted to who she was," and that "[s]he kept defying me.  She kept telling me that she wasn't going to let me talk to the children."  When Arnold told the children to go inside, Wilder testified that he said, "You need to stop.  I need to talk to these kids.  I need to do what I was instructed to."  Wilder stated that Arnold made references to Reynolds already knowing about the issue with Breuer and said, "I'm tired of that lady across the street.  I'm tired of her harassing me.  I'm tired of this.  It's going to stop."

Wilder stated that he eventually told Arnold "If you keep interfering with my job . . . you're getting ready to get yourself in trouble," and after Arnold became louder and more boisterous, he pulled out his handcuffs and stated, "You are getting ready to go to jail.  You need to stop."  When Arnold did not comply, Wilder told her that she was under arrest, but when he "grabbed her wrist to put the handcuff on, she pulled back and pulled away from [him]."  Wilder denied tackling Arnold, contending that both of them "fell to the ground" after he lost his balance when grabbing Arnold's wrists.  As Arnold tried to crawl away, Wilder attempted to "effect the arrest and gain control of her, [but Arnold] was fighting wildly . . . . She kept pulling her hands away . . . . She was yelling for the kids to 'get him off of me, get him off of me.'"  Wilder denied intentionally putting Arnold in a chokehold, asserting that he "reached down and picked her up by her waist . . . . [S]he refused to walk and she went limp . . . . And she slid down between my grasp, and I had her about her shoulders and her neck."  He conceded that Arnold eventually ended up in a chokehold position.

Additionally, Wilder testified that when he got Arnold across the street and into the police car, he was unable to shut the door because Arnold repeatedly kicked the door open and eventually kicked him in the face, knocking his glasses sideways.  As a result, Wilder sprayed Arnold with pepper spray while she was in the back of his police car to gain control of her and to stop her from kicking him.  Wilder denied going up to the house after Arnold escaped from the police car, and he testified that he only spoke to Brown one time, simply telling her that he appreciated her assistance.

Arnold was released from jail late in the day on October 25, returning home approximately five or six hours after the incident took place.[6] She immediately went to the hospital and was reunited with her children on the following day. Arnold had some bruises on her neck and wrists, but she did not sustain permanent injuries. After the incident, Jacob experienced panic attacks and had anger issues. Caroline experienced anxiety issues and took Paxil for approximately three years. Both children saw school counselors as a result of the incident.

On October 29, 2003, Arnold was arraigned on one count of disorderly conduct, two counts of assault in the third degree of a police officer, one count of resisting arrest, and one count of escape in the second degree. Several of these offenses were felonies. Arnold pleaded not guilty on November 19, 2003. On February 18, 2004, defendants formally presented Arnold and her attorney with an agreement pursuant to which all criminal charges against Arnold would be dismissed if she promised that she would not "initiate, pursue, or otherwise become involved in a civil or criminal action in any form against Strathmoor . . . or against Officer James Wilder." Over the objections of her attorney, Arnold did not sign this agreement and proceeded to trial. The felony charges were amended to misdemeanor charges and, on April 26, 2004, Arnold was found not guilty of the misdemeanor charges.

**B.**

Arnold filed suit in state court on behalf of herself, Jacob, and Caroline against Wilder, Strathmoor, Dewey Cornell, Jr. (the mayor of Strathmoor), Kingsley, and Breuer on October 22, 2004. The case was removed to federal court on November 12, 2004. Breuer, Cornell, and Kingsley were subsequently dismissed from the suit. On November 29, 2006, the district court partially granted and partially denied the remaining defendants' summary judgment motion. The following claims survived summary judgment: (1) Arnold's claims against Wilder for (a) false arrest, (b) malicious

---

[6]DeCamillis had called a district court judge from Arnold's house and arranged for Arnold to be released on her own recognizance once she was "booked" downtown. He then went downtown with his father and Armacost to wait for Arnold to be released after bond was set.

prosecution, (c) battery, and (d) intentional infliction of emotional distress; and (2) Arnold's claims against Strathmoor for (a) negligent hiring, and (b) vicarious liability for Wilder's alleged state-law torts that survived summary judgment.

At trial, the district court dismissed Arnold, Jacob, and Caroline's IIED claims against Wilder. It also dismissed Arnold's claims against Strathmoor because Strathmoor had agreed that it would be responsible for any damages in the event of a verdict against Wilder.

Following the conclusion of trial, on August 14, 2008, the jury awarded Arnold $2,400 for physical injury including pain and suffering, $5,000 for legal expenses, $50,000 for mental pain and suffering, and $1,000,000 in punitive damages. After the entry of judgment, Caroline timely appealed the district court's dismissal of her IIED claim.

On September 8, 2008, defendants filed a post-trial motion arguing that (1) Arnold's punitive-damages award should be reduced; (2) a directed verdict should be granted regarding Arnold's claims of false arrest and malicious prosecution because the evidence at trial failed to establish the necessary element of absence of probable cause; (3) a directed verdict should be granted regarding Arnold's claim of malicious prosecution because the evidence and law failed to support her assertion that the prosecution was continued at Wilder's insistence; and (4) the admission of evidence concerning settlement discussions in Arnold's criminal prosecution and allowance of cross-examination of Wilder as to whether other witnesses were lying necessitated a new trial. Arnold opposed this motion.

On August 31, 2009, the district court denied defendants' request for a directed verdict on the false arrest and malicious prosecution claims. It found no error in its evidentiary rulings at trial and therefore denied the motion for a new trial. The district court did, however, reduce Arnold's punitive-damages award to $229,600, finding that the original award was excessive and unconstitutional. Arnold timely appealed this decision. Defendants cross-appealed.

**II.**

Defendants argue that the district court erred in denying their motion for judgment as a matter of law on Arnold's false arrest and malicious prosecution claims, contending that probable cause existed, as a matter of law, for Arnold's arrest and prosecution, and that Arnold's malicious prosecution claim fails for other reasons.

We review de novo a district court's denial of a renewed motion for a judgment as a matter of law. *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007). In doing so, we apply the same deferential standard as the district court: "The motion may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001) (citing *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996)). Neither the district court nor the reviewing court may reweigh the evidence or assess the credibility of witnesses. *See id.* at 600.

**A.**

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (citation omitted). "Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge 'were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense.'" *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alteration in original). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of the arrest*." *United States v. Pearce*, 531 F.3d 374, 380-81 (6th Cir. 2008) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)) (emphasis added).

Defendants argue that "[p]robable cause existed, as a matter of law, for the arrest and prosecution of Arnold[] for at least three separate crimes: 'escape,' 'resisting arrest,' and 'hindering communication to a law enforcement officer of information relating to the possible commission of an offense.'" According to defendants, Wilder had probable cause to arrest Arnold for escape because she ran into her house after being released from the police car by one of her son's friends; Wilder had probable cause to arrest Arnold for resisting arrest because she "pulled away or pulled back when Wilder attempted to take her into custody" and grabbed at the edges of the car door "to prevent Wilder from placing her in the [police] car"; and Wilder had probable cause to arrest Arnold for hindering communication to a police officer because she instructed the children to go into the house while Wilder "was attempting to speak to them about playing in others' yards [and] . . . was telling [Arnold] that he was not through talking with the boys."

Whether there was probable cause for Arnold's arrest should be determined as of the time she was initially seized by Wilder in her front yard. *See Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains [her] freedom of movement, '*through means intentionally applied*.'") (citations and internal quotations omitted) (emphasis in original). A reasonable jury could have concluded that Wilder's arrest of Arnold was not based on probable cause to believe she was committing or had committed the crime of escape because Arnold did not flee from the police car until after she was initially seized.

Further, an individual commits the crime of escape, under Kentucky law, if she "depart[s] from custody . . . when the departure is unpermitted." Ky. Rev. Stat. Ann. § 520.010(5) (West 2010). The term custody "means restraint by a public servant pursuant to a *lawful* arrest . . . ." Ky. Rev. Stat. Ann. § 520.010(2) (West 2010) (emphasis added). Although Arnold departed from custody by running away from the

police car, she could have been justified in doing so if her arrest was unlawful.  The comments to subsection (2) explain that "lawful arrest" or "lawful custody" means

> that a prisoner's escape from custody where there is *no* authority and detention is patently void does not constitute an offense.  Thus, an escape may be justified where the arresting officer acts without authority so that the resulting arrest is illegal.  However, where detention is merely irregular or voidable but *in good faith* and *under color of law*, the prisoner is not justified in escaping and commits a criminal offense in so doing.  In such instances, the prisoner must use the channels of due process to obtain his release.  This principle has been held to be applicable to circumstances such as informality of arrest, failure of the arresting officer to comply with statutory requirements, defects in the warrant, etc.

*Id.*, cmt. Ky. Crime Comm'n (citation omitted; emphasis added).  A reasonable jury could have found, based on the evidence presented at trial, that Wilder arrested Arnold without authority and therefore she was justified in fleeing from the police car.

A reasonable jury could also have found that Wilder did not have probable cause to believe that Arnold had committed or was committing the crimes of resisting arrest, hindering communication to a police officer, or any other crime.  Under Kentucky law, an individual is guilty of resisting arrest when she

> intentionally prevents or attempts to prevent a peace officer, recognized to be acting under color of his official authority, from effecting an arrest of the actor or another by:  (a) [u]sing or threatening to use physical force or violence against the peace officer or another; or (b) [u]sing any other means creating a substantial risk of causing physical injury to the peace officer or another.

Ky. Rev. Stat. Ann. § 520.090 (West 2010).  The comments to this statute explain that "[t]he offense of resisting arrest includes only forcible resistance and excludes other forms of nonsubmission to authority.  Neither flight from arrest nor passive resistance are punishable under this section . . . ."  *Id.*, cmt. Ky. Crime Comm'n.

Hindering communication to a police officer is not a crime under Kentucky law.  Rather, the  relevant crime is intimidating a participant in the legal process.  An individual is guilty of this crime, when,

> *by use of physical force or a threat directed to a person he believes to be*
> *a participant in the legal process*, he or she : . . . . [h]inders, delays, or
> prevents the communication to a law enforcement officer or judge of
> information relating to the possible commission of an offense or a
> violation of conditions of probation, parole or release pending judicial
> proceedings.

Ky. Rev. Stat. Ann. § 524.040 (West 2010) (emphasis added).

Arnold's actions prior to being seized by Wilder would not lead a prudent individual to believe that Arnold "'had committed or was committing an offense.'" *Pyles*, 60 F.3d at 1215 (quoting *Beck*, 379 U.S. at 91). The evidence presented at trial, viewed in the light most favorable to Arnold, indicates that Arnold spoke with Wilder calmly, asked the children to go inside, informed Wilder that she had already spoken to Reynolds about the children playing in the neighbors' yards, and "pulled away or pulled back when Wilder attempted to take her into custody." None of these actions constitutes resisting arrest. Arnold also did not use physical force toward or threaten the children in her care in order to hinder, delay, or prevent their communications with Wilder regarding the possible commission of an offense.

Thus, the district court did not err in denying defendants' renewed motion for a judgment as a matter of law with respect to Arnold's false arrest claim because a reasonable jury could have concluded, based on the evidence presented at trial, that Wilder did not have probable cause to arrest Arnold.

**B.**

Kentucky law requires a plaintiff to prove the following six elements to show malicious prosecution:

> (1) the institution or continuation of original judicial proceedings, either
> civil or criminal . . . , (2) by, or at the instance, of the plaintiff, (3) the
> termination of such proceedings in defendant's favor, (4) malice in the
> institution of such proceeding, (5) want or lack of probable cause for the
> proceeding, and (6) the suffering of damage as a result of the proceeding.

*Raine v. Drasin*, 621 S.W.2d 895, 899 (Ky. 1981) (citations omitted).

Defendants do not dispute that Arnold has satisfied four of these six factors, but argue that the district court should have granted their motion for judgment as a matter of law because (1) there was probable cause for Arnold's arrest and prosecution; and (2) Wilder was without power to continue the prosecution against the wish of the assigned prosecutor.[7] As noted above, a reasonable jury could have found that Wilder did not have probable cause to arrest Arnold. Additionally, "viewing the totality of the circumstances at the time of [Arnold's] arrest and through the time that the criminal proceeding against [her] commenced, a reasonable jury could have concluded that there was no probable cause to believe that . . . [she] had committed any crime." *Sykes*, 625 F.3d at 311; *see also Mahaffey v. McMahon*, 630 S.W.2d 68, 69 (Ky. 1982) (concluding that the plaintiff had "made a prima facie case of lack of probable cause by his testimony at trial").

Therefore, the only remaining issue with respect to Arnold's claim of malicious prosecution is whether Wilder instituted or continued the proceedings. Wilder argues that because he did not have the power to cause the continuation of Arnold's prosecution, her malicious prosecution claim must fail. However, Arnold can prevail if she demonstrates that Wilder *either* instituted *or* caused the continuation of her prosecution.

A reasonable jury could have found that Wilder instituted the proceedings against Arnold. The evidence showed that Wilder did not have to arrest Arnold, but he insisted on doing so, and that he made an effort to charge her with felonies, rather than misdemeanors. Further, Wilder testified that he was angry with the prosecutor because he dismissed the felony charges against Arnold "without talking to [Wilder] first because he wasn't the one that was assaulted by [Arnold]." Defendants' attorney also conceded at trial that "the charges were initiated at the instance [sic] of the officer by his making an arrest and filling out a uniform citation . . . . [Plaintiffs] have proven that element of their claim."

---

[7]Defendants also claim that Arnold improperly supported her argument that Wilder continued the prosecution with evidence concerning settlement discussions. This claim is considered in the context of the second issue raised by defendants, which deals specifically with evidentiary issues.

A reasonable jury could have concluded, based on the evidence presented at trial, that Arnold had satisfied the elements of a malicious prosecution claim under Kentucky law. The district court therefore did not err in denying defendants' motion for judgment as a matter of law, and, in the alternative, for a new trial, with respect to Arnold's malicious prosecution claim.

## III.

Defendants argue that the admission of a draft settlement agreement that was never executed and testimony that Arnold's criminal defense attorney recommended that she enter into such an agreement, but that Arnold refused to do so, violated Federal Rule of Evidence 408 and would require a new trial on the issues of damages. Further, they argue that the district court erred in permitting Arnold to cross-examine Wilder regarding whether other witnesses were lying when their testimony was inconsistent with his.

We review a district court's denial of a new-trial motion for abuse of discretion, reversing only if we have a "definite and firm conviction that the trial court committed a clear error of judgment." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000) (quoting *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989)). We review under the same standard a district court's admission of testimony or other evidence, *see United States v. Talley*, 164 F.3d 989, 998 (6th Cir. 1999), and a district court's "rulings on the scope of cross-examination and admissible rebuttal evidence." *United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002).

## A.

Pursuant to Rule 408, settlement evidence is generally not admissible at trial. Fed. R. Evid. 408. However, this Rule "does not require exclusion if the evidence is offered for [another] purpose[]. . . . [such as] proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution." *Id.* We have admitted settlement evidence where it was "offered to show the state of mind of the witnesses," *Croskey v. BMW of N. Am., Inc.*,

532 F.3d 511, 519 (6th Cir. 2008), and where wrongful acts – such as libel, assault, breach of contract, and unfair labor practices – were alleged to have occurred during settlement negotiations, *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284, 1293-94 (6th Cir. 1997).

In this case, Arnold was permitted to testify that she was shown a Covenant Not to Sue (Covenant) early in the pre-trial process, and that Tim McCall (McCall), her criminal defense attorney, repeatedly advised her to sign the Covenant based on Wilder and Cornell's representations that if she signed it, "they [would] completely drop everything." The Covenant was also introduced into evidence. Arnold further testified that McCall told her "that he felt like . . . [she] should not go [to trial], that [she] was taking too big of a risk, that [she] should just consent not to sue." She stated that McCall informed her that if she went to trial, "he could not guarantee that [she] would not spend some time in jail or have some fine . . . , [and] that [she] needed to seriously think about the fact that if [she] went through with the criminal case and did not consent not to sue . . . [she] could end up having to serve jail time." Arnold testified that she ultimately chose not to sign the Covenant and to go to trial.

Counsel for Strathmoor and Wilder had objected to the introduction of this evidence and testimony during a pre-trial conference. Arnold argued that the evidence and testimony would support the "institution or continuation" of proceedings prong of her malicious prosecution claim. Additionally, she contended that the "fact that she was looking at originally two felonies, subsequently the felonies were dismissed, and she then was facing misdemeanors, actually went to trial on these misdemeanor charges, all that evidence [went] to her damages [with respect to her] . . . . emotional distress claims." At the time, Arnold was also contemplating having the prosecutor testify that "he would have dismissed [Arnold's charges] . . . without a stipulation of probable cause or anything else. However, Officer Wilder objected to that . . . ." The prosecutor ultimately did not take the stand. The district court allowed the evidence and testimony in question to be presented at trial, stating that the settlement "had nothing to do with

this civil case . . . . That was a settlement of the criminal case. I have a civil malicious prosecution case."

The evidence here was not offered "to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed. R. Evid. 408. Moreover, it did not concern the settlement of civil claims, which "the policy behind Rule 408 seeks to encourage." *United States v. Logan*, 250 F.3d 350, 367 (6th Cir. 2001) (citing *United States v. Peed*, 714 F.2d 7, 10 (4th Cir. 1983)). Rather, the Covenant and Arnold's testimony were used to show that Wilder participated in the process of settling Arnold's *criminal* charges – he was present at the settlement discussions and his name was on the Covenant – thereby potentially establishing an element of Arnold's malicious prosecution claim, and that Arnold suffered emotional distress in deciding to proceed to trial in light of the charges she was facing and the recommendations of her attorney regarding the Covenant. As a result, the district court did not abuse its discretion in allowing the Covenant to be admitted into evidence, in permitting Arnold to testify regarding the potential dismissal of her criminal charges, and in denying defendants' motion for a new trial on this ground.

**B.**

In arguing that the district court erred by permitting Arnold to ask Wilder on cross-examination whether numerous witnesses were lying because their testimony had been inconsistent with that of Wilder, defendants substantially rely on the Second Circuit's decision in *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987), where that court held that prosecutorial cross-examination which compelled a defendant in a criminal case to state that a law enforcement officer lied in his testimony was reversible error. The Second Circuit reasoned that "[d]eterminations of credibility are for the jury, not for witnesses." *Id.* (citations omitted).

"Our circuit has not directly addressed the propriety of asking a defendant whether other witnesses are lying. Although there may be exceptions, the general principle that credibility determinations are meant for the jury, not witnesses, applies

here," and the district court erred by permitting counsel to question Wilder in this manner. *United States v. Dickens*, No. 09-4529, 2011 WL 2836367, at \*4 (6th Cir. July 19, 2011) (footnote omitted).   However, this error was harmless in light of other evidence produced at trial.  *Barnes v. City of Cincinnati*, 401 F.3d 729, 742-43 (6th Cir. 2005).  We are confident that the questioning did not affect the outcome of the trial.

## IV.

At trial, the district court granted defendants' motion for judgment as a matter of law on Caroline's IIED claim, finding that Wilder's conduct was not directed toward Caroline.  It also noted that Caroline could have prevailed on her claim had Kentucky adopted the second paragraph of the Restatement (Second) of Torts § 46, but that Kentucky had not done so.  On appeal, defendants additionally argue that Wilder's conduct was not extreme and outrageous because he did not know Caroline or Arnold before the incident and therefore "he had neither intent toward Caroline, nor knowledge that he could deem his actions 'reckless' toward Caroline."  Caroline contends that she satisfies all the elements of an IIED claim under Kentucky law.

We review de novo a district court's grant of judgment as a matter of law. *Jackson v. FedEx Corporate Servs., Inc.*, 518 F.3d 388, 391-92 (6th Cir. 2008).  Such a motion requires the district court to determine "whether there was sufficient evidence presented to raise a material issue of fact for the jury." *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir. 1991) (citation omitted).  The district court should decline to submit a matter to the jury "when viewed in the light of those inferences most favorable to the nonmovant, there is either complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ." *Id.* (citation omitted).

Kentucky has not yet adopted § 46(2), which subjects an actor to liability where the conduct is directed at a third person, and the actor "intentionally or recklessly causes severe emotional distress [] to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm."   Several opinions of the Court of Appeals of Kentucky have noted that the tort of outrageous

conduct (or IIED) was "first recognized in this jurisdiction in *Craft v. Rice, Ky.*, 671 S.W.2d 247 (1984), wherein the Court adopted Restatement (Second) of Torts § 46(1) only.  By this we mean the Supreme Court did not adopt § 46(2) . . . . " *Allen v. Clemons*, 920 S.W.2d 884, 886 (Ky Ct. App. 1996).  The Court of Appeals of Kentucky has declined to adopt § 46(2) because the Supreme Court of Kentucky has not spoken on the issue.  *See id.*; *see also Fryman v. Masters*, No. 2004-CA-000932-MR, 2005 WL 1993464, at \*2 (Ky. Ct. App. Aug. 19, 2005).

The district court correctly found that Wilder's conduct was not directed at Caroline, as required by § 46(1), and that the situation fit within the parameters of § 46(2), which Kentucky had not yet adopted.  Moreover, Caroline never asked the district court to anticipate whether the Supreme Court of Kentucky would adopt § 46(2) if it were squarely presented with a case meeting its requirements.  As a result, the district court did not err in granting judgment as a matter of law on Caroline's IIED claim.

## V.

Arnold appeals the district court's reduction of her punitive-damages award from $1,000,000 to $229,600 based on its determination that the $1,000,000 award, which was 17.4 times larger than the compensatory award, was excessive and unconstitutional.

We apply a de novo standard of review when reviewing a district court's determination of the constitutionality of a punitive-damages award.  *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436 (2001); *see also Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 999 (6th Cir. 2007).

Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Cooper Indus.*, 532 U.S. at 432.  "By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citation omitted).  Although states have discretion to impose punitive damages, " it is well established that there are procedural and substantive

constitutional limitations on these awards." *Id.* (citation omitted). In particular, an excessive punitive-damages award can violate the Fourteenth Amendment. *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). The Supreme Court has set forth three factors to be considered in deciding whether a punitive-damages award is excessive: (1) "the degree of reprehensibility" of the conduct; (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and [her] punitive damage award"; and (3) "the difference between [the punitive damages] and the civil penalties authorized or imposed in comparable cases." *Id.* at 575. The third factor is not at issue in this case.

In evaluating the first factor – the degree of reprehensibility of the conduct – courts should consider whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419 (citation omitted). Further, the Court has explained that "nonviolent crimes are less serious than crimes marked by violence or the threat of violence" and that "'trickery and deceit' are more reprehensible than negligence." *Gore*, 517 U.S. at 576 (citations and internal quotations omitted).

With respect to the second factor, the Court "rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award," *id.* at 582 (citation omitted) (emphasis in original), and has stated that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Id.* The Court has also reasoned that a higher ratio may "be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* Thus, it has declined to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would

fit every case." *Id.* at 583 (citations and internal quotations omitted). However, the Court has held that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm*, 438 U.S. at 425, stating in several opinions that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety," *id.* (citation omitted).

We have held, however, that the "Supreme Court's cases on the ratio component of the excessiveness inquiry – which involved substantial compensatory damages awards for economic and measurable noneconomic harm – are . . . of limited relevance" in § 1983 cases where "the basis for the punitive damages award was the plaintiff's unlawful arrest and the plaintiff's economic injury was so minimal as to be essentially nominal." *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 645 (6th Cir. 2005). Several of our sister circuits have reached the same conclusion. *See, e.g.*, *Mendez v. Cnty. of San Bernadino*, 540 F.3d 1109, 1121 (9th Cir. 2008) (upholding a 125,000 to one ratio in a § 1983 case and concluding that "[r]atios in excess of single digits in § 1983 suits . . . will not generally violate due process when the victim suffers no compensable injury"); *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1016 (5th Cir. 2003) ("[A]ny punitive damages-to-compensatory damages 'ratio analysis' cannot be applied effectively in cases where only *nominal* damages have been awarded, such as the § 1983 suit before us.") (emphasis in original); *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) ("In *Gore*, a 500 to 1 ratio was 'breathtaking.' However, in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration.").

With respect to the degree of reprehensibility of the conduct, the district court in this case found that "there was no meaningful physical injury in this case . . . . [h]owever the plaintiff's injury was greater with respect to constitutional considerations." It noted that "Wilder's reckless disregard for the safety of [Arnold] was also acknowledged by the jury in its award." The district court determined that there "was no evidence of

disregard for the safety of others, despite Wilder's unrestrained conduct toward [Arnold]." It concluded by stating that

> it is the intentional and malicious character of [Wilder's] conduct that makes it reprehensible and deserving of a punitive award. . . . It is sufficient to note that the escalation by Wilder from a routine call concerning children through neighboring yards to his assault and arrest of a mother in the front yard of her home in the presence of her children, compounded by a lack of probable cause for the arrest and prosecution, so shocked the jury that it sent a clear message through its award that this was conduct beyond the bounds of acceptable police behavior.

However, the district court concluded that Arnold's punitive-damages award was excessive because although Arnold's physical injury and physical pain and suffering were minimal, the "jury awarded her $50,000 for the mental pain and suffering she endured at the hands of the defendant . . . . [indicating that it] apparently had no difficulty quantifying this harm," and therefore "the award [fell] within traditional parameters, rather than within the exceptional circumstances where the injury is hard to detect or the monetary value difficult to determine." Therefore, it found the ratio of punitive to compensatory damages to be too high and concluded that "an award of four times the amount of [Arnold's] actual damages satisfies the purpose for which the award was made without exceeding constitutional limitations."

In support of the district court's determination, defendants argue on appeal that there was no (1) meaningful physical injury; (2) indication that Wilder manifested disregard to the safety of others; (3) showing of "replicated transgressions"; or (4) "indication of intentional malice, trickery, or deceit." Financial vulnerability was not an issue in this case. Further, in support of their argument that the district court properly reduced Arnold's punitive-damages award, defendants rely on several decisions that overturned ratios of 9.5 to 1 and 3 to 1, respectively. *See Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 486 (6th Cir. 2007); *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 594 (8th Cir. 2005). However, neither of these cases, or any of the other cases defendants cite in support of their claim, involve § 1983 actions.

More to the point is *Romanski* – the only case in which we have evaluated the constitutionality of a punitive-damages award in the § 1983 context. In *Romanski*, a seventy-two year old casino patron picked up a five cent token lying in an unattended slot machine's tray. 428 F.3d at 632. She was then approached and surrounded by plain-clothed security officers, one of whom explained to her that she had committed "slot-walking" (the policy against this practice was not posted anywhere in the casino). *Id.* at 633. Romanski was taken to a small, window-less room, accused of stealing the token, and ultimately ejected from the casino. *Id.* At some point in time, Romanski asked to use the bathroom, but she was not allowed to enter it by herself; she was escorted to the restroom and an officer waited for her outside her stall. *Id.* at 634. Once she was ejected from the casino, Romanski was initially only permitted to wait for her bus home in the parking lot even though it was extremely hot and humid outside. A jury ultimately awarded Romanski $279 in compensatory damages and $875,000 in punitive damages. *Id.* at 635.

On appeal, we considered whether Romanski's punitive-damages award was so excessive that it did not comport with due process. We first noted that "where 'injuries are without a ready monetary value,' such as invasions of constitutional rights unaccompanied by physical injury or other compensable harm, higher ratios between the compensatory or nominal award and the punitive award are to be expected." *Id.*, 428 F.3d at 645 (citing *Argentine v. United Steel Workers of Am.*, 287 F.3d 476, 488 (6th Cir. 2002)). We determined that, in order to establish whether the punitive award at issue is within constitutional limits, the best approach is "to compare it to punitive awards examined by courts 'in other civil rights cases to find limits and proportions.'" *Id.* at 646 (citation omitted). After conducting a review of these awards, we reached the following two conclusions: (1) "substantial punitive awards in § 1983 cases . . . tend to accompany conduct that results in physical or psychological harm"; and (2) "in the typical § 1983 case in which punitive damages are awarded, the defendant is an individual police officer, not the police department or municipality (which, odds are, have deeper pockets than the officer), let alone a deeply pocketed company. . . ." *Id.* at 647. We then held that a punitive-damages award of $600,000, which was "sixty per cent of the casino's

daily intake at the time of the verdict," would satisfy the demands of the due process clause, as "a $600,000 award is comfortably within the ballpark of the punitive damages awards in the civil rights cases we have canvassed." *Id.* at 649-50.

Because this is a § 1983 case involving constitutional violations, a higher ratio of punitive to compensatory damages is to be expected and such a ratio would not necessarily violate due process. Despite the district court's statement to the contrary, there is no reason to believe the jury had no difficulty quantifying the non-economic harm at issue. Arnold suffered harm at the hands of Wilder not only on October 25, 2003, but also for the following seven months, as she was prosecuted and stood trial as a result of the incident. Further, the Supreme Court has repeatedly stated that there is no mathematical formula or bright line test in this regard.

On the other hand, the jury awarded Arnold $57,400 in compensatory damages, which is not a nominal amount. Further, although we held in *Romanski* that a ratio of 2,150 to 1 was permissible, the plaintiff in that case was only awarded $279 in compensatory damages and the defendant was a very wealthy private casino company. Here, Strathmoor – a municipality – will be responsible for paying Arnold's award on behalf of Wilder. Taking all of these factors into consideration, we conclude that while remittitur was clearly appropriate, the district court erred in mechanically applying a four to one ratio. We therefore decrease Arnold's original punitive-damages award to $550,000 so that the ratio of punitive to compensatory damages is in the single digits, but reverse the district court's determination of $229,600.

## VI.

For the foregoing reasons, we **AFFIRM** the district court's denial of defendants' post-trial motion with respect to Arnold's false arrest and malicious prosecution claims and related evidentiary claims and the district court's grant of judgment as a matter of law on Caroline's IIED claim. Further, we **MODIFY** the district court's reduction of Arnold's punitive-damages award and **REMAND** for entry of judgment consistent with this opinion.