NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0480n.06

No. 08-5964

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Aug 05, 2010
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

HECTOR GUAJARDO,

      Defendant-Appellant.

On Appeal from the United
States District Court for the
Eastern District of Tennessee
at Chattanooga

_____/

Before:     **GUY, MOORE, and GRIFFIN, Circuit Judges.**

     **RALPH B. GUY, JR., Circuit Judge.** Defendant Hector Guajardo appeals from the denial of his motion to suppress evidence—including a large quantity of cocaine and heroin—seized following the stop and search of his vehicle. The district court, adopting the magistrate judge's recommendation, found that the stop was supported by reasonable suspicion, that the duration of the stop was not unreasonable, and that the search of the two tubs of cat litter in which the drugs were found did not exceed the scope of the defendant's consent to search. On appeal, defendant challenges the validity of the stop and the scope of the admittedly consensual search. After review of the record, including the transcript of the evidentiary hearing and the video recording of the stop, we find no error and affirm.

**I.**

Tennessee Highway Patrol Officer Kevin Hoppe, a trooper for more than ten years, was patrolling I-75 in McMinn County, Tennessee, on the morning of August 29, 2007.  At 8:28 a.m., having completed an earlier traffic stop, Trooper Hoppe positioned his marked patrol car in the median in order to monitor the northbound traffic.  Within twenty or thirty seconds, Hoppe observed a red sports car traveling in the right-hand lane at well-below the posted speed limit.  Hoppe watched as the car approached, and saw it cross the "fog" line separating the lane of travel from the shoulder several times.  The car, being driven by the defendant, braked and slowed further once it was in a position for the driver to notice the patrol car.  Hoppe testified that the car crossed the fog line once more after it passed him.

Hoppe was concerned that the driver was either impaired or falling asleep, and explained that he was aware of problems with impaired drivers in that area coming from a nearby methadone clinic.  Hoppe also noticed that defendant's headlights were not on, even though it had been raining lightly.  Deciding to investigate, Hoppe activated his lights, which also re-activated the dashboard video camera at 8:29:49 a.m., as he pulled out of the median.  Hoppe caught up with the defendant's car and—pacing his patrol car with the defendant's—estimated that the defendant was traveling at 48 m.p.h. in a 70-m.p.h. zone.  Hoppe also noted that two trucks had slowed behind the defendant's car.  Defendant sped up to 55 m.p.h. before pulling over to stop on the shoulder of the highway.

When the stop was effected at 8:32 a.m., Hoppe approached on the passenger's side and asked to see defendant's license, registration, and proof of insurance.  Defendant, who

was driving, admitted that he did not have his driver's license because he had lost his wallet and denied having any other identification. The passenger Jose Lara produced a Texas ID card, but no driver's license. Hoppe asked the defendant to get out of the car with his registration and proof of insurance. Standing behind the car, Hoppe advised the defendant that he should have had his lights on because of the rain, and then asked the defendant if he had been drinking. Defendant denied being intoxicated, and Hoppe testified that he was quickly satisfied that defendant was not driving while impaired.

Looking at the registration and insurance, Hoppe noted that the month-to-month insurance had been purchased a day or two earlier in El Paso, Texas, and proceeded to ask defendant where they were from and where they were going. Defendant explained that they were from San Antonio, Texas, and were going to Knoxville, Tennessee, to see about doing asbestos-removal work. Hoppe was familiar with asbestos removal from his service in the Navy and knew that identification and special certification would be required. When asked about this, defendant explained that he had lost his wallet the night before in Baton Rouge, Louisiana. During this exchange, defendant exhibited some signs of being nervous, including swinging his arms, looking distressed, and having his voice crack.

Hoppe then talked briefly with Lara, who confirmed that they were going to Knoxville but admitted that he did not have any paperwork and had not done asbestos work before. Lara was wearing a Jose Malverde (grim reaper) pendant, which Hoppe knew to be associated with drug traffickers. At 8:36 a.m., Hoppe began to take down some information, and defendant provided a date of birth and volunteered his driver's license number from

memory. At 8:38 a.m., Hoppe called the national database known as the BLOC HIDTA watch center, which is maintained by the Bureau of Immigrations and Customs Enforcement (ICE), to run computer checks on the defendant and Lara. Hoppe testified that this database was more comprehensive and returned results more quickly than calling dispatch.[1]

Ten minutes later, Hoppe decided to relocate from the shoulder of I-75 and asked the defendant to drive to the next exit approximately four miles away. Defendant complied and, while en route, Hoppe received the return call from the HIDTA watch center. The computer check confirmed that the driver's license number matched the name given by the driver, but provided no information about the height, weight, or other identifying features of that person. Hoppe was still unable to confirm that the defendant was Hector Guajardo. After defendant exited the highway a few minutes later, Hoppe asked the defendant what he was planning to do about his driver's license, whether he had anything illegal in the car, and for consent to search the car for "ID and stuff." Defendant denied having contraband in the car and gave consent to search at 8:56 a.m.—approximately 25 minutes after the initial stop.

After patting down Lara for weapons, Hoppe started searching the passenger side of the car. He looked through the trunk next, where two large containers of cat litter caught his attention. Hoppe asked Lara about it, who said the cat litter was for defendant's sister in San Antonio, but said they did not have time to take it to her before leaving for Knoxville. Hoppe thought this was odd, proceeded to remove all the containers and bags from the trunk, and continued to search the trunk. Hoppe searched the driver's side, a bag from inside the car,

---

[1]There is a break in the video until 8:43 a.m., during which Hoppe changed the tape in the video recorder.

the engine compartment, and the passenger side again.  Hoppe testified that he once found identification hidden in an engine compartment.  Finally, Hoppe called Lara over to the car and had him put everything except the cat litter back into the trunk.

Hoppe was suspicious that contraband was inside the cat litter containers, noting that the plastic strip sealing one of the containers appeared to have been tampered with, that both containers seemed heavier that he expected from their labels, and that one container was heavier than the other.  At 9:15 a.m., Hoppe instructed Lara to open one of the cat litter containers and Hoppe reached into the cat litter to find a brick of what would later be confirmed to be cocaine.  Lara and the defendant were placed under arrest.  Further investigation revealed that the containers held approximately ten kilograms of cocaine and three kilograms of heroin.[2]

Defendant was charged, along with Lara, in a three-count indictment with conspiracy to possess with intent to distribute, and two substantive offenses of possession with intent to distribute more than five kilograms of cocaine hydrochloride and more than one kilogram of heroin.  *See* 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A).  Defendant moved to suppress the evidence on the grounds that the seizure was the product of a constitutionally unreasonable search and seizure.  After an evidentiary hearing, the magistrate judge recommended that the motion to suppress be denied. Defendant objected and, after a de novo review of the evidence, the district court adopted the magistrate judge's recommendation and

---

[2] Defendant does not argue that the stop was pretextual, presumably because it is well settled that the constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officer. *Whren v. United States*, 517 U.S. 806, 813 (1996).

denied the defendant's motion to suppress. Defendant entered a conditional plea of guilty to the conspiracy charge, which preserved his right to appeal the suppression issue, and was sentenced under the "safety valve" provisions to 87 months' imprisonment. *See* 18 U.S.C. § 3553(f). This appeal followed.

## II.

"We review the denial of a motion to suppress de novo, but will accept the district court's factual findings unless they are clearly erroneous." *United States v. Garrido*, 467 F.3d 971, 977 (6th Cir. 2006); *see also United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). When the district court denies a defendant's motion to suppress, this court considers the evidence in the light most favorable to the government. *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010); *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc).

## A.    Validity of the Stop

The Fourth Amendment's prohibition against unreasonable searches and seizures by the government "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In determining the constitutionality of an investigatory detention under *Terry v. Ohio*, 392 U.S. 1 (1968), we employ a two-part inquiry that asks whether there was a proper basis for the stop and whether the degree of intrusion was reasonably related in scope to the circumstances of the stop. *Caruthers*, 458 F.3d at 464. Although "virtually every other circuit court of appeals has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation," this

circuit has required probable cause to justify an investigatory stop for *completed* misdemeanor traffic violations. *United States v. Simpson*, 520 F.3d 531, 540 (6th Cir. 2008); *see also United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007). This court has also held, however, that when the stop is for an *ongoing* violation—no matter how minor—reasonable suspicion will be sufficient to justify an investigatory stop. *Simpson*, 520 F.3d at 541.

Defendant argues that Hoppe did not have probable cause to believe he had committed any of the following traffic violations at the time of the stop: (1) driving too slowly in violation of Tenn. Code Ann. § 55-8-154; (2) failing to have his headlights on in the rain as required by Tenn. Code Ann. § 55-9-406; or (3) failing to maintain his lane of travel as required by Tenn. Code Ann. § 55-8-123. The government has abandoned any argument that the first two of these could have provided a valid basis for the stop.

Indeed, the government does not respond to defendant's argument that there was neither a posted minimum speed in the area, nor probable cause to believe that he was driving in such a way as to impede the normal and reasonable movement of traffic so as to violate Tenn. Code Ann. § 55-8-154. Defendant also emphasizes that Tenn. Code Ann. § 55-9-406(b)(1) requires the use of headlights "when rain, mist, or other precipitation . . . necessitates the constant use of windshield wipers by motorists." From the video evidence, it appears that although Hoppe had been using his windshield wipers at least intermittently during the prior traffic stop, the amount of precipitation at the time of the stop did not necessitate the constant use of the patrol car's windshield wipers.

This leaves the third of the alleged traffic violations, which the government contends may provide an alternative basis for this court to affirm. That is, the government maintains, having observed the defendant cross the fog line several times, Hoppe had probable cause to believe that the defendant failed to maintain his lane of travel in violation of Tenn. Code Ann. § 55-8-123. *See United States v. Garrido-Santana*, 360 F.3d 565, 571 (6th Cir. 2004) ("A police officer may lawfully stop a motorist whom he has probable cause to believe has committed a traffic violation."). The district court did not rely on this violation, but instead found that the stop was justified because Hoppe had reasonable suspicion that the defendant was engaged in the *ongoing* offense of driving while intoxicated in violation of Tenn. Code Ann. § 55-10-401. *See Simpson*, 520 F.3d at 541. Defendant's main contention on appeal, applicable to either of these justifications, is that Hoppe's testimony about observing the defendant's car cross the fog line should not be believed.

Specifically, defendant argues that the view captured by the dashboard camera after Hoppe had positioned his patrol car in the median suggested that it was "unlikely" that Hoppe could have seen defendant's car cross the fog line. Hoppe, the only witness at the suppression hearing, testified that, in fact, he could see the lines on the roadway and explained that his vantage point was different from that of the dashboard camera. Without offering any evidence to contradict Hoppe's testimony, defendant states that it is "curious" that Hoppe did not see him cross the fog line after the camera began recording. That fact, however, does not contradict or impeach Hoppe's testimony. After pulling out of the median, Hoppe had to catch up to the defendant, who had undoubtedly seen the patrol car,

and maneuver around truck traffic before pacing defendant's car and signaling for the defendant to stop. These arguments do not provide a sufficient basis to set aside the district court's determination that Hoppe was a credible witness. *Garrido-Santana*, 360 F.3d at 573.

That leaves only the question of whether Hoppe had reasonable suspicion to believe that the defendant was driving while impaired. Reasonable suspicion "'requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.'" *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (citation omitted). Hoppe testified that he observed defendant's car brake and swerve once it was in a position to see his patrol car, saw defendant's car cross the fog line three times in a relatively short distance, and noted that defendant was traveling at well-below the posted speed limit. Hoppe suspected that the driver was impaired or falling asleep, and testified that he had arrested an impaired driver coming from the nearby methadone clinic the day before this stop. Viewing the evidence in the light most favorable to the government, it was not clearly erroneous for the district court to credit Hoppe's testimony concerning his observations of defendant's driving before deciding to make an investigatory stop. *Garrido-Santana*, 360 F.3d at 572. Because Hoppe had reasonable suspicion to believe that the defendant was driving while impaired, the initial investigatory stop was proper under the Fourth Amendment.

The second part of the inquiry asks whether the *Terry* stop was reasonable in scope and duration. *Id*. at 571; *see also Florida v. Royer*, 460 U.S. 491, 500 (1983). That is, the stop must "last no longer than is necessary to effectuate the purpose of the stop," and "the

investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

Typically, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Here, before Hoppe's reasonable suspicion that defendant was driving while impaired could be dispelled, the initial request for license, registration, and proof of insurance revealed that the defendant was driving without a license in violation of Tennessee law. Defendant does not dispute that it was objectively reasonable and within the scope of the initial stop for Hoppe to ask the defendant for this information and to conduct the computer check in an attempt to verify the defendant's identity. *See Garrido-Santana*, 360 F.3d at 573-74 (rejecting defendant's contention that reasonable suspicion was necessary to continue to detain driver after valid stop for speeding in order to complete computer check of driver's license even though citation for speeding had already been issued); *Hill*, 195 F.3d at 269 (holding that driver's license check completed after citation for traffic offense was issued was within original scope

of traffic stop).[3]

Rather, defendant asserts without elaboration that the purpose of the stop was concluded once the computer check confirmed that the name given by the driver matched the driver's license number he had provided from memory. As a result, defendant asserts that Hoppe unreasonably extended the stop once they reached the exit by asking defendant additional questions and requesting permission to search the car. On the contrary, the results of the computer check confirmed only that the driver's license number belonged to Hector Guajardo, not whether the driver was in fact Hector Guajardo. The district court found both that the driver's identity had not been established and that no arrest or citation had been issued for driving without a license. *See* TENN. CODE ANN. § 40-7-118(b)(1) and § 55-50-351. As a result, the stop had not been concluded when, at the next exit, the defendant got out of his car and Hoppe asked the defendant when he would get his license and requested permission to search the car for "ID and stuff." Defendant consented at 8:55 a.m. to a search of the car.

The district court did not err in finding that the initial stop was proper, that the continued detention was justified, reasonable in duration—lasting approximately 25 minutes—and reasonably related in scope to the circumstances of the stop.

---

[3]Nor does defendant claim that it was unreasonable for Hoppe to ask questions that were unrelated to the reason for the initial stop, including whether weapons, drugs, or anything else illegal was in the car. *See Arizona v. Johnson*, __U.S.__, 129 S. Ct. 781, 783 (2009) ("An officer's inquires into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the stop's duration."); *see also United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010) (holding some questioning about unrelated conduct permissible "so long as the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop").

**B.       Scope of the Consensual Search**

Defendant concedes that he voluntarily consented to a search of his car, and disputes

only whether Hoppe exceeded the scope of that consent by searching the sealed containers

of cat litter in which the drugs were found.  A district court's determination whether a search

exceeded the scope of the consent is a question of fact, which we review for clear error.

*Garrido-Santana*, 360 F.3d at 570.  "The standard for measuring the scope of a suspect's

consent under the Fourth Amendment is that of 'objective' reasonableness—what would the

typical reasonable person have understood by the exchange between the officer and the

suspect?"  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

The video evidence shows that after stopping on the exit ramp, Hoppe called the

defendant over, asked him when he was going to get his license, and then asked if there was

"anything of an illegal nature in the vehicle . . . any alcohol, guns, anything like that."

Defendant answered, "no."  Hoppe replied, "I want to look in it for ID and things like that,

do you have a problem with that?"  Defendant answered, "no."  Hoppe added the following:

> Okay, if I found—I'm not going to find no—you got no—you're not a drug
> user, nothing like that—no alcohol, no guns . . . okay.

> What I want to look for, what I get a lot of times is people say they lost their
> IDs and they're not who they say they are.  And you may be that, and if you are
> we're going to go on, if I don't find any ID up there, okay, but I get a lot of
> people who say, "oh, my name's Hector so and so," and their real name is
> Bobby Lewis.  You know, you don't have any pictures on you and that's a
> problem, okay, just take your hand out of your pocket.  Do you mind if I search
> it for ID and stuff?

Defendant argues that the only reasonable understanding of this exchange is that the consent

was to a search for identification only—not contraband such as drugs, alcohol, or guns—and

that the consent did not extend to the closed container of cat litter.

In *Garrido-Santana*, this court held that by asking the defendant whether he possessed any illegal contraband such as drugs or stolen goods and then asking for consent to search the defendant's car, the officer reasonably informed the defendant that such contraband was the object of any search. 360 F.3d at 576. The court then held that because the defendant consented to the search without explicit limitation on its scope, it was objectively reasonable for the officer to conclude that the defendant had consented to a search of the car for drugs or stolen goods and that the consent would extend to a search of any containers within the car that could reasonably be expected to hold such contraband. *Id.*

Here, Hoppe asked the defendant if there was anything of an illegal nature such as drugs, alcohol, or guns in the car, which informed the defendant of the wide-ranging objects of the requested search. The defendant consented to the search of the car without expressly limiting the scope, and it was not clear error for the district court to conclude that a reasonable person would have understood this exchange to consent to a search of the car for identification, pictures, or items of an illegal nature such as drugs, alcohol, or guns.[4]

This brings us to the question of whether defendant's consent to search extended to the closed cat litter containers taking up most of the trunk. The Supreme Court explained in *Jimeno* that, although one may delimit the scope of a search to which he consents, no explicit authorization is required to search a particular container "if his consent would reasonably be

_____

[4]The district court assumed that Hoppe was referring to pictures like illegal pornography, but pictures were not mentioned with the things of "an illegal nature." It seems more likely that pictures would be relevant to establishing the defendant's identity.

understood to extend to a particular container." *Jimeno*, 500 U.S. at 252. The Court in

*Jimeno* held that because the officer told the suspect he believed there were narcotics in the

car before asking for permission to search the car, and the suspect consented without placing

any explicit limitation on the scope of the search, "it was objectively reasonable for the police

to conclude that the general consent to search [the suspect's] car included consent to search

containers within that car which might bear drugs." *Id*. at 251. Explaining that "[a]

reasonable person may be expected to know that narcotics are generally carried in some form

of a container" and are rarely "'strewn across the trunk or floor of a car,'" the Court held that

the consent to search extended to a closed paper bag lying on the floor of the car. *Id*.

(citation omitted).

In reaching this conclusion, the Court in *Jimeno* distinguished another case in which

it was "held that consent to search the trunk of a car did not include authorization to pry open

a locked briefcase found inside the trunk." *Id*. Defendant relies on the Court's further

comment that: "It is very likely unreasonable to think that a suspect, by consenting to the

search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk,

but it is otherwise with respect to a closed paper bag." *Id*. at 251-52.

In this case, defendant argues both that a reasonable person would not expect to find

identification in a sealed container of cat litter, and that, as with a locked briefcase, one

would not expect the general consent to search to extend to a "factory-sealed" container of

cat litter. These questions need not be resolved in this case because, as the district court also

found, Hoppe had probable cause to believe contraband would be found in the cat litter

containers at the time they were opened and searched.

As the stop developed, Hoppe learned that the defendant was driving across country without identification, to see about asbestos removal work without identification or certifications, presented month-to-month insurance purchased days before, and claimed to have taken the two large tubs of cat litter because there was not time to deliver it to defendant's sister. Hoppe knew from experience that it was not uncommon for someone who claimed to have lost his license to be lying about his true identity, and defendant's identity could not be confirmed. When Hoppe lifted the supposedly factory-sealed tubs of cat litter, he noted that they seemed heavier than the 35 pounds they were supposed to be and, more importantly, that one was heavier than the other. Also, one of the blue plastic seals was striated so as to suggest that it had been tampered with. At the time the first cat litter container was opened, Hoppe had probable cause to believe that contraband would be found inside. *See California v. Acevedo*, 500 U.S. 565, 580 (1991) (holding the Fourth Amendment does not preclude a warrantless search of a container in an automobile where there is probable cause to believe that it contains contraband).

**AFFIRMED.**