NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0082n.06

Nos. 09-5861, 09-5862, 09-5863

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jan 24, 2012*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF KENTUCKY |
| RONALD E. JEFFRIES, | ) | |
| LUCIANA DENISE MEADOWEAL, | ) | |
| RICKEY CALLOWAY, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before: KENNEDY, GIBBONS, and KETHLEDGE, Circuit Judges.

**JULIA SMITH GIBBONS, CIRCUIT JUDGE.** Ronald Jeffries, Luciana Meadoweal, and Rickey Calloway were charged in a multiple-count indictment implicating each of them to varying degrees in a drug possession and distribution conspiracy. Calloway and Meadoweal were convicted by a jury; Jeffries pled guilty. On appeal, all three defendants-appellants challenge the denial of their respective motions to suppress. In addition, Calloway argues that the admission of a number of pieces of evidence violated the Federal Rules of Evidence and his Confrontation Clause rights, and that his sentence is unconstitutional. Meadoweal further argues that there was insufficient evidence to convict her. For the reasons below, we affirm the defendants' convictions and sentences.

-1-

## I. Factual Background

On January 21, 2009, a grand jury returned a nine count superseding indictment charging Jeffries, Calloway, and Meadoweal with various criminal offenses related to a drug trafficking operation. Count One charged all three defendants with conspiracy to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846. Count Four charged all three defendants with possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and Count Five charged all three defendants with traveling in interstate commerce to commit their drug crimes in violation of 18 U.S.C. §§ 1952(a)(1) and (a)(3). These substantive counts related to cocaine found in the trunk of a car that Meadoweal drove to Houston.

Counts Two and Three charged Calloway and Jeffries with violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. §§1952(a)(1) and 1952(a)(3) related to a drug run that Calista Shirley, who is not a party in this case, made to Houston. Counts Seven and Eight charged Calloway and Jeffries with possession of more than five grams of crack and more than 500 grams of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1). These two counts related to drugs found at a "stash house" that Jeffries rented on Middle Lane in Louisville, Kentucky. Count Six charged Calloway alone with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Count Nine, seeking forfeiture, is not relevant to this appeal.

A jury found Calloway guilty on Counts One through Six. The jury found Meadoweal guilty on Counts One, Four and Five. Instead of going to trial, Jeffries pled guilty to Counts One, Seven and Eight, but reserved the right to appeal the denial of his motion to suppress. The district court

sentenced Calloway to life in prison, Meadoweal to 120 months of imprisonment, and Jeffries to 204

months of imprisonment.

**A.**

The facts of this drug conspiracy case are complex. In late 2006, Jeffries took a Lincoln

Town Car to an auto shop in Louisville, Kentucky to have a hidden compartment installed in the

trunk. Louisville police were tipped off and obtained a warrant to place a GPS tracking device on

the car. The police posed as firemen needing to investigate a gas leak in the auto shop, entered the

premises, and placed a GPS device on the Lincoln, without the knowledge of the shop's owner.

After the hidden compartment was installed and the Lincoln returned to Jeffries, police

tracked the car to a house on Middle Lane which Jeffries, police later discovered, was renting.

Police also visually observed the Lincoln at Middle Lane. The police further tracked the Lincoln to

a house that Jeffries owned on Pinnacle Lane and to a house owned by Calloway on Oakburn Lane.

The police tracking the Lincoln took particular note when the vehicle went southbound, leaving

Louisville; they suspected that the driver had left town to complete a drug run. The Lincoln traveled

to Sugar Land, Texas, near Houston, stayed less than 24 hours, and then began to return north. At

that point in Louisville, a number of officers assembled and waited for the Lincoln to return.

However, the Lincoln never returned to Louisville.

Rather, on December 18, 2006, when the Lincoln was returning from Sugar Land, a

Louisiana police officer noticed that the Lincoln darted "evasive[ly]" into the right lane upon seeing

him. The officer, further observing that the Lincoln was following the car in front of it too closely

and had a license plate ring that partially obstructed the license plate, pulled over the vehicle. Meadoweal was behind the wheel.

Meadoweal claimed she had been visiting San Antonio and denied consent to search the vehicle. Another officer ran a canine around the car to check for narcotic odors, and the canine alerted on the trunk—indicating a positive odor of narcotics. The officers suspected a false compartment in the trunk but were unable to open it. After bringing the Lincoln to a substation and opening the false compartment, officers found approximately nine kilograms of cocaine smeared with mustard to mask the smell, plus $80,000. Portions of the interaction between the officers and Meadoweal were captured on video and played for the jury at trial.

Before bringing the car to the substation, officers noticed that Meadoweal had been talking on the phone with "Rick" (Calloway's first name), as that name appeared on Meadoweal's cell phone. When asked who Rick was, Meadoweal responded that he was her boyfriend. Cell phone records introduced at trial showed that Calloway had traveled south from Louisville to the Houston area on the same day as Meadoweal and that the two had spoken on the phone while traveling to and returning from Sugar Land. On the morning of Meadoweal's arrest, Calloway also placed several phone calls to Jeffries.

After being arrested, Meadoweal attempted to contact Calloway from jail. Meadoweal called her daughter and asked her if she knew Rick's number. Her daughter provided Meadoweal with the number 502-457-2630—the same number that had been tracked moving south from Louisville to the Houston area—so that her daughter could contact Calloway. Meadoweal asked her daughter to

call Calloway and give him four numbers of bail bondsmen. From jail, Meadoweal also talked to

her brother to ask that Calloway pay her bond of $24,000.

**B.**

The Louisville police officers who had placed the tracking device on the Lincoln soon

learned that the driver had been arrested in Louisiana for drug possession. The officers then obtained

and executed a search warrant for Calloway's house on Oakburn Lane. In the pocket of a jacket in

Calloway's house, the officers recovered a receipt from "Love's Country Store," located about 30

miles from where Meadoweal was pulled over, and dated December 18, 2006, the same day that

Meadoweal was arrested. Written on the back of this receipt were the four numbers of the bail

bondsmen that Meadoweal had asked that Calloway contact. In the same jacket, officers found a

Western Union receipt for $24,060—the amount of Meadoweal's bond plus fees. The officers also

recovered $27,480 in cash and two firearms from Calloway's house , as well as a luggage tag on

which the number 502-457-2630 was written.

Also in Calloway's house, officers discovered the driver's license of Calista Shirley. Shirley

had been arrested outside of Houston in June of 2006 for possessing thirty kilograms of cocaine in

her trunk. After Shirley's arrest, Calloway paid for Shirley's legal representation. Shirley was

subsequently convicted of possession of more than five kilograms of cocaine with intent to

distribute.

Officers arrested Calloway after searching his house. From jail, Calloway called Jeffries and instructed him to empty an account they held together. Shortly thereafter, a man identifying himself as Jeffries withdrew nearly $35,000 from the account, nearly emptying it.

## C.

Having arrested both Meadoweal and Calloway, and having searched Calloway's residence, officers then focused on Jeffries and the house on Middle Lane—which they suspected was the stash house. The officers suspected this residence because a neighbor had seen both Calloway's Hummer and the Lincoln parked on Middle Lane, and officers had independently observed the Lincoln on Middle Lane, both visually and by using the GPS. The officers made contact with a neighbor, who promised to call when Jeffries returned to Middle Lane. When the neighbor called on February 5, 2007, police rushed to the Middle Lane residence but Jeffries had already left. Police soon found Jeffries at a nearby liquor store. Jeffries denied having just been near Middle Lane and twice denied knowing anything about Middle Lane. The officers then brought out their K-9, which alerted for a positive drug odor on Jeffries's clothing. After arresting Jeffries, officers did not find any drugs on his person, but they did find $6,500 in cash.

The officers then obtained and executed search warrants for Jeffries's vehicle and the Middle Lane residence. Inside the Middle Lane house, officers found crack and powder cocaine, several bags and wrappers with cocaine residue, digital scales, a pressing machine to make cocaine bricks, and adulterants used to dilute cocaine. The officers also found a Christmas card addressed to "Rickey," as well as a rental agreement for the Middle Lane property in Jeffries's name.

## II. Motions to Suppress

Meadoweal, Calloway, and Jeffries all challenge the district court's denial of their respective motions to suppress evidence. Calloway challenges the sufficiency of the warrant used to search his house on Oakburn Lane, Meadoweal challenges the legality of her traffic stop in Louisiana when she was driving the Lincoln, and Jeffries challenges the warrantless search of his person and the sufficiency of the search warrant for his truck and the Middle Lane residence.

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States. v. Henry*, 429 F.3d 603, 607 (6th Cir. 2005) (internal quotation marks omitted). Thus, we review *de novo* "the district court's determination as to whether certain facts establish a seizure or detention in violation of the Fourth Amendment." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000). In our review, we "consider the evidence in the light most favorable to the government." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (internal quotation marks omitted).

### A.

Calloway argues that the search warrant for his home on Oakburn Lane was defective because it was not supported by probable cause. Specifically, he contends that the facts asserted in the affidavit used to obtain the search warrant lacked independent corroboration and reliability and that there was no nexus between his home and the cocaine found in the Lincoln.

The standards that guide a magistrate judge's determination of probable cause are well settled:

> In making a probable cause determination, an issuing Magistrate Judge's task is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*United States v. Lazar*, 604 F.3d 230, 241 (6th Cir. 2010) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)) (internal quotation marks omitted). When reviewing the decision to grant a search warrant, we "pay great deference to the Magistrate Judge's finding of probable cause, and should uphold a warrant so long as the Magistrate Judge had a substantial basis for . . . concluding that a search would uncover evidence of wrongdoing." *Id.* (internal quotation marks omitted). Nonetheless, an affidavit must demonstrate "a nexus between the place to be searched and the evidence sought." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (internal quotation marks omitted). This nexus must show a "fair probability—not an absolute certainty—that evidence of the crime will be found at the location." *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008).

Calloway's claim that the search warrant authorizing the search of his home was defective is without merit. Calloway first argues that the affidavit in support of the warrant did not verify the reliability of two confidential informants who told officers of Calloway's drug activities. The reports of these informants, standing alone, would not support a finding of probable cause, absent independent corroboration or indicia of the informants' reliability. *See United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005). But the affidavit included a host of other assertions, the most telling of which was that the Lincoln town car was driven by Calloway, was seen at the residence shortly

before it left for Texas, and then was interdicted with nine kilograms of cocaine less than 48 hours later. These probative facts were combined with other important details, such as Calloway's known association with Jeffries, his own (albeit dated) drug felony history, his previous possession of false-bottomed containers at an airport, and his carrying away of trash from the residence, a practice that the detective/affiant believed was consistent with attempting to avoid police detection. Given these numerous sworn assertions, the informants' statements were but a minor addition, ultimately unnecessary to a finding of probable cause to search Calloway's home.

For similar reasons, we reject Calloway's argument that there was no nexus between the cocaine found in the Lincoln in Louisiana and his home on Oakburn Lane. That Calloway was suspected of being a drug dealer would not have been, by itself, sufficient to establish probable cause to search his home. *See McPhearson*, 469 F.3d at 525 n.3. But "where the allegation of drug dealing is coupled with independently corroborated information from police officers, it may be sufficient to establish probable cause." *Id.* The affidavit at hand was replete with corroborating information: the Lincoln was often seen at the Oakburn residence, was sometimes operated by Calloway, was seen at the Oakburn residence immediately before leaving Louisville for Texas, and was interdicted in Louisiana. And once again, Calloway had been seen removing trash from the premises, had associated with a known felon on the premises, and had a prior drug felony history himself. Thus, there was a "fair probability" that evidence of drug activity would be found at Calloway's residence, and the affidavit submitted in support of the warrant was sufficient.

**B.**

Meadoweal challenges the denial of her motion to suppress on grounds that police unlawfully pulled her over in Louisiana. Officer Vernon, who pulled Meadoweal over, noted that after Meadoweal "evasive[ly]" switched lanes, she followed the car in front of her too closely and had an obstructed license plate. Both following too closely and having an obstructed license plate are illegal under Louisiana law. *See* La. Rev. Stat. Ann. § 32:81(A); La. Rev. Stat. Ann. § 47:507(B).

There is some confusion in this Circuit as to whether the probable cause or reasonable suspicion standard applies in traffic stops. *United States v. Hughes*, 606 F.3d 311, 316 n.8 (6th Cir. 2010). It appears that "virtually every other circuit," save our own, has found that reasonable suspicion suffices to justify an investigatory stop for a traffic violation. *United States v. Simpson*, 520 F.3d 531, 540 (6th Cir. 2008). Nonetheless, binding authority dictates that we apply the probable cause standard to "completed" misdemeanor traffic violations. *Hughes*, 606 F.3d at 316 n.8; *United States v. Guajardo*, 388 F. App'x 483, 487 (6th Cir. 2010); *Simpson*, 520 F.3d at 540–41. Out of an abundance of caution, we assume that Meadoweal's driving too closely was a completed traffic violation—insofar as the violation was completed by the time she was pulled over—and that therefore the probable cause standard applies. *See Hughes*, 606 F.3d at 316 n.8. However, we apply the reasonable suspicion standard to Meadoweal's obstructed license plate violation because it was an "ongoing" violation that did not cease when she was pulled over. *See Simpson*, 520 F.3d at 541.

Meadoweal argues that Officer Vernon did not have probable cause to pull her over for following too closely because he estimated that she was about one hundred feet behind the next vehicle—and this court has found in previous cases that only distances of ten to thirty feet were "too

close" under comparable statutes. *See United States v. Sanford*, 476 F.3d 391, 395–96 (6th Cir. 2007); *United States v. Valdez*, 147 F. App'x 591, 594–95 (6th Cir 2005).

We are unpersuaded by this argument. The Louisiana statute sets forth no exact number of feet that is considered "too close"—as that distance depends on what speed is "reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway." *See* La. Rev. Stat. Ann. § 32:81(A). Here, Vernon, a patrolman with fourteen years of experience, and whose duties included patrolling that section of the interstate, noticed that Meadoweal was driving between sixty-five and seventy miles an hour while following a vehicle by approximately one hundred feet. Vernon asserted in his affidavit that Meadoweal was "following another vehicle too close, as the weather was foggy." In so doing, Vernon explained that he took into account weather conditions—which the statute instructs him to do—when arriving at his assessment that Meadoweal was too close to the vehicle in front of her. Thus, Vernon did not base his determination on an impermissible "hunch" or "gut feeling," as Meadoweal contends. Rather, he based his determination, necessarily made in a split-second, on his training and experience. Given the vehicle's speed and weather conditions he observed, Vernon "reasonably believed" that Meadoweal had violated La. Rev. Stat. Ann. § 32:81(A), thereby satisfying the probable cause standard. *See Hughes*, 606 F.3d at 320.

Vernon further attested in his affidavit that he pulled Meadoweal over because she had a partially obstructed license plate, also a violation of Louisiana law. *See* La. Rev. Stat. Ann. § 47:507(B). Meadoweal contends that this court in *United States v. Simpson*, 520 F.3d 531, 544 (6th

Cir. 2008), cautioned against an overly broad reading of a Tennessee license plate obstruction statute similar to the Louisiana statute at issue here. In *Simpson*, we were concerned that the district court had interpreted the state statute with a "kind of sweeping generality" that was contrary to the state court's interpretation of that statute. *Id.* But no such concern presents itself here, as Louisiana courts *themselves* have found that partially obscured license plates support a finding of reasonable suspicion to justify a traffic stop. *See State v. Pena*, 988 So.2d 841, 846 (La. Ct. App. 2008) (finding reasonable suspicion to stop vehicle in part because, "although the numbers and letters on the license plate were clearly visible, the top and bottom portions of the plate were partially obscured by a license plate frame"). Therefore, the officers had reasonable suspicion that Meadoweal had violated the license plate obstruction statute.

The officers had probable cause to believe that Meadoweal was following too closely and reasonable suspicion to believe that she was driving with an obstructed license plate—both violations of Louisiana law. Because these two independent bases are sufficient to justify Meadoweal's traffic stop, the district court did not err in denying Meadoweal's motion to suppress.

**C.**

Jeffries also challenges the district court's denial of his motion to suppress. He first argues that officers did not have probable cause to arrest him based on their interaction with him at the liquor store. He asserts that after the drug dog alerted on his pocket but no drugs were found on his person, he should have been free to go. We are not convinced by this argument.

-12-

"Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Arnold v. Wilder*, 657 F.3d 353, 363 (6th Cir. 2011) (internal quotation marks omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* (internal quotation marks and emphasis omitted).

The following facts were known to the officers at the time they found Jeffries at the liquor store: (1) Jeffries had installed a false trunk in the Lincoln; (2) Jeffries had occasionally driven the Lincoln; (3) the Lincoln, shortly after the false trunk was installed, was stopped in Louisiana with a large amount of cocaine and cash hidden in the false trunk; (4) Jeffries had been seen at the Middle Lane house; (5) Jeffries was a business associate of Calloway, who had already been arrested on drug charges; and (6) Jeffries paid for the legal defense of Shirley, the drug smuggler in Houston. Taken as a whole, these facts clearly connected Jeffries to the cocaine that was found in the Lincoln, as well as to a broader drug conspiracy involving Calloway. The only "reasonable conclusion to be drawn from the[se] facts," all of which were known to the arresting officers, is that the officers had probable cause to arrest Jeffries when they saw him at the liquor store. *See Arnold*, 657 F.3d at 363. Therefore, when the officers approached Jeffries at the liquor store, they had probable cause to arrest him. The events that transpired thereafter—the pat down, the use of the drug dog, and the seizure of the money—do not affect our probable cause analysis.[1]

---

[1]That Detective Seelye gave somewhat contradictory responses when asked whether he believed that he had probable cause to arrest Jeffries before engaging him at the liquor store also

-13-

Second, Jeffries argues that the search warrant issued for the house on Middle Lane was not supported by probable cause because the affidavit did not state that any criminal activity had occurred on Middle Lane and focused nearly exclusively on Calloway, not Jeffries.[2] Once again, we give "great deference" to the magistrate judge's determination that there was "a fair probability that contraband or evidence of a crime w[ould] be found" at Middle Lane. *Lazar*, 604 F.3d at 241.

The factual assertions contained in the affidavit were sufficient to establish probable cause to search the Middle Lane residence. Although the mere fact that Jeffries was suspected of being a drug trafficker and had previously been arrested for drug offenses would not alone have provided probable cause to search the residence, ample corroborating information contained in the affidavit links the Middle Lane residence to the drug conspiracy. *See McPhearson*, 469 F.3d at 525 n.3. The affidavit asserted that Jeffries had at times operated the Lincoln, noting that the same Lincoln had been seen at Middle Lane in December 2006 and had later been interdicted with large amounts of cocaine. The affidavit also asserted that Jeffries's vehicle had been seen at Middle Lane in December 2006, that Jeffries had been seen at Middle Lane immediately prior to his arrest but had lied about being there, and that Jeffries associated with Calloway, who had already been arrested and whose truck had also been seen at Middle Lane. That no officer actually saw evidence of criminal activity matters not, as "it is reasonable to suppose that some criminals store evidence of their crimes

---

does not alter our analysis because "the probable cause inquiry is an objective one," and thus "the officer's subjective reasons for making an arrest" are not determinative. *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007).

[2]The government has assumed that Jeffries had a privacy interest in the house sufficient to establish standing to challenge the search, and we do so as well.

in their homes, even though no criminal activity or contraband is observed there." *United States v. Williams*, 544 F.3d 683, 686–87 (6th Cir. 2008) (internal quotation marks omitted).  Taken together, the information contained in the affidavit indicated a "fair probability" that evidence of drug activity would be found at Middle Lane.

Third, Jeffries argues that "all of the information contained in the affidavit was nearly two months old" and was therefore stale.  In determining whether a probable cause finding was improperly based on stale information, we consider "the defendant's course of conduct; the nature and duration of the crime; the nature of the relevant evidence; and any corroboration of the older and more recent information." *United States v. Gardiner*, 463 F.3d 445, 471 (6th Cir. 2006) (internal quotation marks omitted).

Jeffries's bald assertion that all of the information in the affidavit was nearly two months old is simply not true: the affidavit, dated February 5th, stated that Jeffries—on February 5th, the day he was arrested—lied to police about being at Middle Lane or even knowing anything about the Middle Lane residence.  The magistrate judge could not have had more current information about Jeffries's deceptive behavior.  Moreover, the fact that the affidavit contained information that was two months old, such as the presence of the Lincoln at Middle Lane, does not automatically render it stale.  The nature of a drug conspiracy is ongoing. *See United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003).  Therefore, the affidavit appropriately tied together older information about the vehicles' presence at Middle Lane with new information that Jeffries had just been at Middle Lane and then lied about it.  This practice, which considers "the continuing nature of the drug conspiracy

. . . and the corroboration of older and more recent information," is an acceptable means of showing probable cause and was sufficient here. *See id.*

### III. Evidentiary Claims

### A.

Calloway makes several arguments related to the admission of certain pieces of evidence. He first argues that the district court erred in admitting evidence that an unknown individual threatened a witness. The witness was the owner of the shop where Jeffries had the false trunk installed, and the witness was threatened for supposedly cooperating with law enforcement. No objections were made to the admission of this evidence, so plain error review is appropriate. *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 548 (6th Cir. 2003). To establish plain error, one must show (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Hunter*, 558 F.3d 495, 501 (6th Cir. 2009).

As a general matter, under Federal Rule of Evidence 404(b), "evidence that [a] defendant . . . threatened a witness[] is admissible to show consciousness of guilt." *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986). But such evidence is only admissible where the government provides sufficient evidence that the defendant was behind the threat. *See United States v. Stephens*, 549 F.3d 459, 462 (6th Cir. 2008) (bad act may be introduced under Rule 404(b) only where government presents sufficient evidence from which a jury could "reasonably conclude that the act occurred and that the defendant was the actor") (internal quotation marks omitted).

Here, the government points to no direct evidence linking Calloway to the threat by the unknown individuals, beyond a broad assertion that "Calloway had a habit of using others to do things for him." This is not sufficient to show that Calloway was responsible for the threat and therefore the evidence was improperly admitted. However, this erroneous admission does not rise to the level of plain error. The discussion of the threat is contained on less than one page of a trial transcript that stretches to nearly 1,000 pages. And the evidence linking Calloway to the drug conspiracy—his trip to Houston, his phone calls to Meadoweal, his payment for Meadoweal's bond, the evidence found in his home—is overwhelming. On this record, it cannot be said that admitting evidence of the threat to the witness "'affected the outcome of the district court proceeding.'" *United States v. Bailey*, 488 F.3d 363, 368 (6th Cir. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). Therefore, the district court did not commit plain error in admitting the evidence of the threat.

**B.**

Calloway also argues that, because the officers did not have personal knowledge that a jacket and a cell phone found at Calloway's residence belonged to him, the government failed to lay a proper foundation for the admission of this evidence as required by Federal Rule of Evidence 602. Calloway did object to the admission of all evidence seized at Calloway's house by means of his motion to suppress but did not object under Rule 602 at trial. Because Calloway did not make a Rule 602 objection in the trial court, we review for plain error. *See United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989) ("The 'plain error' rule . . . applies to a case . . . in which a party objects to the

submission of evidence on specific grounds in the trial court, but on appeal the party asserts new grounds challenging the evidence.").

Calloway's Rule 602 argument regarding the jacket is without merit. Calloway points to no instance in the record where any witness referred to the jacket as "Calloway's jacket"; at most he points to instances where the prosecutor made reference to "Calloway's jacket." But even if this was improper, there was strong circumstantial evidence that the jacket—or, more importantly, the receipt found inside it—did indeed belong to Calloway.[3] Thus, any violation of Rule 602 did not amount to plain error.

Calloway's Rule 602 argument regarding the cell phone also fails. Calloway alleges that the prosecution and some witnesses were allowed to refer to a cell phone found on his person as having the number 502-457-2630, without providing a foundation for this knowledge. However, a substantial foundation was laid to link Calloway to that cell phone number, even if not the cell phone itself. From prison, Meadoweal called her daughter and asked her if she knew "Rick's" number. Her daughter then provided the number 502-457-2630. That very same number had been tracked moving south from Louisville to the Houston area and was displayed on Calloway's luggage tag, which was found in his home. On this record, we fail to see any lack of foundation. And if there was error, it

---

[3]The circumstantial evidence showed that (1) the jacket was found at Calloway's house during the execution of the search warrant; (2) in the pocket of the jacket was a receipt from "Love's Country Store," located about 30 miles from where Meadoweal was arrested in Louisiana, and dated December 18, 2006, the same day that Meadoweal was arrested; (3) Calloway traveled to the Houston area on the same day as Meadoweal; (4) written on the back of this receipt were the four numbers of the bail bondsmen that Meadoweal had asked Calloway to contact.

certainly did not affect the outcome of the trial and was therefore not plain. *See Bailey*, 488 F.3d at

368.

## C.

Calloway's final evidentiary argument is that the district court erred in admitting audiovisual

recordings of the traffic stops of Shirley and Meadoweal. At trial, Calloway did not object to the

admission of the recording of Meadoweal's stop. Therefore, we review the admission of the

Meadoweal video for plain error. *Bowman*, 350 F.3d at 548. However, Calloway did object to the

admission of the recording of Shirley's stop as hearsay and a violation of the Confrontation Clause.

Therefore, we review the admission of the Shirley video for an abuse of discretion. *United States*

*v. Newsom*, 452 F.3d 593, 601 (6th Cir. 2006).

With one exception (discussed below), Calloway fails to identify *any* particular statement

made by either Meadoweal or Shirley on video that was improperly admitted. Rather, he makes a

blanket assertion that "[t]he recordings were admitted for th[e] truth of the matters asserted and were

not properly admitted under Rule 801(d)(2)(E)." Because Calloway does not direct the attention of

this court to any of the statements that he considers improperly admitted, and because hearsay

determinations turn entirely upon the precise words or conduct at issue, we cannot make an informed

judgment whether the trial court abused its discretion and must therefore uphold its decision to admit

the videos. *See United States v. Benson*, 591 F.3d 491, 502 (6th Cir. 2010); *see also United States*

*v. Sandridge*, 385 F.3d 1032, 1035–36 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived."). For exactly the same reason, Calloway's Confrontation Clause challenge must also fail. Without particular identification of which statements or assertions in either video allegedly amount to testimonial hearsay, this court cannot find error on Confrontation Clause grounds.

Calloway does identify one of Meadoweal's statements that was allegedly admitted improperly. When Officer LeBlanc pulled Meadoweal over, he noticed that she had been talking on her cell phone, and that the name "Rick" appeared on the screen. Having seen Rick's name on the cell phone, the officer testified as follows: "So I went back and asked her, 'Well, who is Rick?' And that's when she explained that was her boyfriend." The government responds that it did not introduce this evidence to show that Rick (Calloway) was in fact Meadoweal's boyfriend. This response is far too dismissive: the government used Meadoweal's statement to prove that Meadoweal was in fact talking to someone named "Rick." This is classic hearsay.

The question is thus whether Meadoweal's statement falls within the co-conspirator hearsay exclusion outlined in Federal Rule of Evidence 801(d)(2)(E), which allows for the admission of a statement "made by the party's coconspirator during and in furtherance of the conspiracy." In order for a statement to qualify under Rule 801(d)(2)(E), "it must first be determined that the conspiracy existed, that the defendant was a member of the conspiracy, and that the co-conspirator's statements were made in furtherance of the conspiracy." *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006) (internal quotation marks omitted). Here, there is strong circumstantial evidence of the

existence of a conspiracy and Calloway's membership in that conspiracy.[4] However, it is less clear whether Meadoweal's bare statement that she was talking to "Rick" could be said to be "in furtherance of" that conspiracy. Yet we need not resolve that issue because the jury already had before it independent evidence that Meadoweal was talking to someone named Rick: the officer testified that "I happened to look at the front of the cell phone, and I saw she had been on the phone with a guy named Rick because the name appeared on the phone . . . ." The jury, in other words, had evidence to link Meadoweal to Calloway even absent Meadoweal's hearsay statement. Thus, even if there was error, it was harmless. Further, because any error in admitting Meadoweal's statement regarding "Rick" was harmless for hearsay purposes, it was also harmless for Confrontation Clause purposes. *See United States v. Martinez*, 588 F.3d 301, 313–14 (6th Cir. 2009).

Calloway also argues that Meadoweal's nonverbal conduct in the video—specifically, her possession of nine kilograms of cocaine—amounted to hearsay. However, for nonverbal conduct to qualify as hearsay, it must be intended as an assertion. Fed. R. Evid. 801(a) (defining "statement" in relevant part as "nonverbal conduct, if the person *intended* it as an assertion") (emphasis added); *Martinez*, 588 F.3d at 311. Here, Calloway makes no argument that Meadoweal intended her

---

[4]In arguing to the contrary, Calloway ignores a great deal of evidence showing the existence of the conspiracy and Calloway's membership in it. Cell phone records introduced at trial showed that Calloway had traveled south from Louisville to the Houston area on the same day as Meadoweal, and that they had spoken on the phone while traveling to and returning from Sugar Land. After being arrested for possession of cocaine, Meadoweal attempted to contact Calloway from jail. Further, the Lincoln with the false trunk had been seen parked at Calloway's house.

possession of cocaine as an assertion—and there is no evidence in the record to support this argument. Thus, we cannot find that Meadoweal's nonverbal conduct was hearsay.[5]

## IV. Calloway's Life Sentence

Calloway asserts various constitutional arguments in an attempt to show that the district court erred in sentencing him to life in prison. We review *de novo* a constitutional challenge to a sentence. *United States v. Graham*, 622 F.3d 445, 452 (6th Cir. 2010).

Calloway first argues that "innumerable criminal defendants have been unconstitutionally sentenced" pursuant to *Almendarez-Torres*, 523 U.S. 224 (1998), which allows for judicial fact-finding of previous convictions. But as we have recently held, *Almendarez-Torres* is still good law, and will remain so until the Supreme Court explicitly overrules it. *United States v. McMurray*, 653 F.3d 367, 371 (6th Cir. 2011). The district court judge therefore did not err in finding the fact of Calloway's previous convictions by a preponderance of the evidence.

Calloway next claims that his life sentence violates the Eight Amendment because it is grossly disproportionate to the crimes he committed. Calloway was sentenced pursuant to 21 U.S.C. § 841(b)(1)(A), which provides for a term of life imprisonment for possession of certain quantities

---

[5]Calloway's reliance upon *Martinez* is unavailing. *Martinez* is factually distinguishable because it involved an expert's nonverbal conduct in a video that he was making in preparation for trial. *Martinez*, 588 F.3d at 311. The question here—whether possession of contraband can be considered nonverbal assertive conduct—is entirely different. Further, while *Martinez* does reference the dissenting opinion in *United States v. Sutton*, 642 F.2d 1001, 1051 (6th Cir. 1980) (Merritt, J., dissenting), which suggested that "nonverbal conduct showing possession and distribution of a large volume of stolen merchandise" can be considered assertive conduct, that does not disturb the fundamental principle that nonverbal conduct is not an assertion unless it is intended as such. *Martinez*, 588 F.3d at 311. And once again, no showing of intent has been made here.

of controlled substances, where the defendant has already committed two or more drug offenses. Calloway was held responsible for 39.395 kilograms of cocaine.

In evaluating Eighth Amendment challenges to sentences, "this court adheres to the Supreme Court's narrow proportionality principle . . . stating that the Eighth Amendment only prohibit[s] extreme sentences that are grossly disproportionate to the crime." *Graham*, 622 F.3d at 452 (internal quotations and citations omitted). Under this test, this court "has continued to reject Eighth Amendment challenges to mandatory life sentences in repeat-offender drug cases." *United States v. Thornton*, 609 F.3d 373, 379 (6th Cir. 2010). Sharply undermining his claim, Calloway makes no attempt to distinguish his case from *United States v. Hill*, 30 F.3d 48, 50–51 (6th Cir. 1994), in which we found life sentences for repeat drug offenders constitutional. *See United States v. Caver*, 470 F.3d 220, 247 (6th Cir. 2006) (finding failure to distinguish *Hill* fatal to Eighth Amendment challenge to sentence). Further, his life sentence, based on the amount of cocaine for which he was held responsible and his repeat-offender status, is squarely in line with similar cases. *See, e.g.*, *Thornton*, 609 F.3d at 379 (rejecting Eighth Amendment challenge and upholding life sentence for repeat offender responsible for 72 kilograms of cocaine). Calloway's sentence therefore is not grossly disproportionate to his crime.

Calloway further argues that his life sentence violates the separation of powers. This argument is clearly foreclosed as we have "'flatly rejected' the claim that mandatory minimums unconstitutionally violate separation-of-powers principles." *United States v. Cecil*, 615 F.3d 678, 696 (6th Cir. 2010) (quoting *United States v. Odeneal*, 517 F.3d 406, 414 (6th Cir. 2008)). Other

circuits have held the same. *See, e.g.*, *United States v. MacEwan*, 445 F.3d 237, 252 (3d Cir. 2006);

*United States v. Holmes*, 838 F.2d 1175, 1178 (11th Cir. 1988).

Calloway's due process challenge fares no better. He argues that due process demands that

he receive more individualized consideration at the hands of a judge with greater discretion.

However, "[t]his contention has no merit since 'the scope of judicial discretion with respect to a

sentence is subject to congressional control.'" *United States v. Dumas*, 934 F.2d 1387, 1389 (6th

Cir. 1990) (quoting *Mistretta v. United States*, 488 U.S. 361, 364 (1989)). Therefore, Calloway's

due process challenge also fails.

## V. Sufficiency of the Evidence

Meadoweal contends that there was insufficient evidence presented at trial that she knew of

the presence of the drugs in the false trunk of the Lincoln. "[F]or challenges based on sufficiency

of the evidence, . . . 'the relevant question is whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (*en banc*)

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). To be found guilty under 21 U.S.C. §

841(a), a defendant must have "(1) knowingly, (2) possessed a controlled substance, (3) with intent

to distribute it." *United States v. Russell*, 595 F.3d 633, 645 (6th Cir. 2010). Meadoweal contends

that there was insufficient evidence that she knew of the cocaine in the trunk, as she had just bought

the car, the false trunk was well-hidden, and there was no trace of mustard—the substance used to

mask the smell of the cocaine—on Meadoweal herself or the inside of the vehicle.

The circumstantial evidence presented at trial was sufficient for a rational trier of fact to find Meadoweal guilty.  Upon being pulled over in Louisiana, Meadoweal told the officers that she had been coming from San Antonio, when in fact the tracking device attached to the Lincoln indicated that she had been coming from Houston.  Meadoweal also told officers that she spent the entire previous weekend in San Antonio, when in fact hotel records showed that she had spent the weekend in Houston.  Further, the evidence showed that Meadoweal spoke with "Rick" immediately upon being pulled over by the police, and then again attempted to contact him from jail.  Finally, in the jacket at Calloway's house was a Western Union receipt for $24,060—the amount of Meadoweal's bond plus fees.  Taken together, this circumstantial evidence was sufficient for a rational trier of fact to find guilt beyond a reasonable doubt.

## VI.

For the foregoing reasons, we affirm the defendants' convictions and sentences.